UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
SELMA MOY,

                               Plaintiff,

                                              Case No.

           -against-

                                              COMPLAINT


NAPOLI SHKOLNIK PLLC, PAUL NAPOLI,
MARIE NAPOLI, GLORIA WERLE,                 **Jury Trial Demanded**
and SALVATORE C. BADALA,

                               Defendants.
-------------------------------------------------------------------------------X

      SELMA MOY, by and through her attorneys, the LAW OFFICES OF FREDERICK K. BREWINGTON, as and for Complaint, against the Defendants, NAPOLI SHKOLNIK PLLC, PAUL NAPOLI, MARIE NAPOLI, GLORIA WERLE, and SALVATORE C. BADALA, (collectively, "Defendants") states and alleges as follows:

**PRELIMINARY STATEMENT**

      1.      This action is hereby commenced for the purpose of seeking to secure protection of, and to redress the deprivation of rights secured and protected by the United States Constitution, 42 U.S.C. § 1981, New York State Executive Law §§ 296, et seq. and the New York City Human Rights Law, N.Y.C. Administrative Code §§ 8-107, et seq., New York State Civil Rights Law §40-c providing for relief from the above-captioned Defendants' unlawful employment practices of engaging in discrimination based upon Plaintiff's race, color and national origin, for retaliation against Plaintiff for engaging in the protected activity of supporting the complaint of a co-worker and complaining of said discrimination, and the creation of a hostile work environment which Plaintiff

was forced to endure. This action also seeks to vindicate the rights of Plaintiff, a Chinese-American woman and attorney who was subjected to adverse employment conditions based upon her race, color, national origin and gender while at the NAPOLI  SHKOLNIK PLLC,  as well as her staunch refusal to tolerate the prevalent corruption, falsification and manipulation of job titles, job duties and discriminatory organization, for which the Plaintiff suffered a  disparate impact when compared with similarly situated white employees.

2.      Specifically, the Plaintiff alleges that the collective Defendants engaged in discrimination and retaliation and negligently, wantonly, recklessly, intentionally and knowingly sought to and did wrongfully deprive Plaintiff of the appropriate employment position, title and pay through acts that were taken against Plaintiff because of her race, color, national origin, gender and for retaliation against Plaintiff for opposing discrimination. These acts resulted in misrepresentation, misinformation, threats, harassment, character assassination, negative impact regarding Plaintiff, which led to humiliation, embarrassment, depravation of job opportunities, permanent injury and harm and other results which continue to mount.

3.      As set forth more fully below, Plaintiff alleges in this action that Defendants NAPOLI SHKOLNIK  PLLC,  PAUL  NAPOLI,  MARIE  NAPOLI,  G L O R I A   W E R L E ,   and SALVATORE C. BADALA,  have engaged in a pattern and practice of race, color, national origin and gender discrimination and retaliation based upon, inter alia: 1) failure to provide Plaintiff, a female Chinese-American supervisor,  with the appropriate staffing, opportunities and resources that were provided to  similarly-situated  white  employees;  2)  the  marginalization  of  Plaintiff  by Defendants; and 3) the disparate impact upon the Plaintiff, a Chinese-American, who supported complaints of discrimination made by another employee and who refused to take part in the systemic

corruption and falsification tactics undertaken by Defendants.

4.      Defendants have engaged in a pattern and practice of systemic, continuous, and intentional discrimination against employees of color and women in the assignments, options, opportunities, maintenance of title and position, advancement opportunities, and compensation decisions. Defendants have denied Plaintiff, other persons of color and women the same advancement opportunities as have been afforded to white employees. This broad pattern of racial, national origin, and gender discrimination has resulted in a far lower percentage of persons of color being engaged and maintained in position of leadership and decision making status as compared to other white employees.

5.      Despite repeated attempts by Plaintiff, and other similarly situated persons of color who were supposed to be supervisory employees to: 1) curtail this severe and pervasive discrimination, and 2) remedy the  falsification and manipulation of facts, Defendants utterly failed to take appropriate corrective actions and permitted the hostile work environment to persist unabated during Plaintiff's employment and in fact took away duties, titles and authority while falsely asserting job performance concerns and taking retaliatory steps to harm Plaintiff and other employees of color.

6.      Plaintiff and other employees of color all suffered a similar fate.  For instance when Plaintiff assisted another person of color who voiced her concerns to Defendants: their complaints were wholly ignored, their authority and decision-making responsibilities were minimized, their information, level of access,  fiscal, and personnel resources were severely restricted, and/or their voices were completely stifled.  Plaintiff experienced this herself.  She and other persons of color were actually and constructively dismissed, forced off the job, forced to resign and/or endure a

retaliatory and hostile work environment.

7.  Plaintiff alleges that the collective Defendants, directly acted and/or allowed its agents, employees, representatives and/or officers to act maliciously and unlawfully, enacting discriminatory policies, and engaging in discriminatory practices which caused Plaintiff to suffer the following injuries:

- Violations of her various statutory rights, including those protected by the 42 U.S.C. §1981; Article 15 of the Executive Law of the State of New York (Human Rights Law) §§ 290 and 296, N.Y.C. Administrative Code §§ 8-107, et seq.;

- Violations of her rights under the Civil Rights Law of the State of New York §40-c;

- Loss of reputation;

- Loss of benefits and pay;

- Loss of title;

- Prolonged alteration of employment and/or temporary/partial alteration of employment opportunities;

- Diminished capacity, incurring special, monetary, and compensatory damages;

- Serious and permanent emotional injury and distress, loss of standing in the community; impact on dignity and loss of self worth; and

- Enduring threats to her current and future employment as a form of intimidation and threat.

8.  Said acts were done knowingly with the consent and condonation of NAPOLI SHKOLNIK PLLC, PAUL NAPOLI, MARIE NAPOLI, GLORIA WERLE, and SALVATORE C. BADALA with the express purpose of targeting, injuring and silencing the Plaintiff, and generally violating her rights as protected by the laws of the United States and state statutes, rules and regulations.

9.      Ms. Moy has been subjected to denial of equal terms and conditions of her employment, as well as being the victim of retaliation for pointing out and reporting to leadership in The Firm her own mistreatment and the de-facto discrimination of other persons of color in the office.  The responses provided to Ms. Moy showed attempts to manipulate the truth and created a false narrative in attempts to mask the obvious discrimination that was taking place.

10.     Plaintiff,  as a Chinese-American woman,  has been forced to experience levels of mistreatment, abuse and differential treatment that demonstrates that Defendants NAPOLI SHKOLNIK PLLC, PAUL NAPOLI, MARIE NAPOLI, GLORIA WERLE, and SALVATORE C. BADALA awareness, no less commitment to providing a non-discriminatory and equitable work environment is lacking and contrary to law.

11.     An examination of the facts supplied in this Complaint make it clear that Ms. Moy has been subjected to a course of discrimination based on her race/color and gender and retaliation which resulted in her recent unlawful termination.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff s rights under 42 U.S.C. § 1981.

13.     As the Southern District is the District wherein a substantial part of the events giving rise to the instant claims occurred, venue is proper pursuant to 28 U.S.C. § 139l(a)(2). Further, venue is proper in the Southern District of New York pursuant to Plaintiff's residence; Defendants' residence; and the Firm's principal place of business are this District.

## ADMINISTRATIVE PREREQUISITES

14.     Plaintiff reserves her right to file a complaint with the Equal Employment Opportunity Commission ("EEOC") alleging violation of Title VII.  When and if the EEOC issues Ms. Moy a notice of right to sue or otherwise dismisses her charge, she will seek leave to amend this Complaint to add her claim under Title VII. Any and all other prerequisites to the filing of this suit have been met.

15.     Contemporaneous with the commencement of this action, Plaintiff has filed a Verified Complaint with the New York City Commission on Human Rights ("City Commission").  Plaintiff reserves the right to withdraw her claims from the City Commission and pursue her NYCHRL claims in court.

16.     Thus, any and all other prerequisites to the filing of this suit have been met.

## PARTIES

17.     Plaintiff Selma Moy (hereinafter,  "Plaintiff" or "Ms. Moy") is a Chinese-American woman, and served as a an attorney working for   NAPOLI  SHKOLNIK PLLC from on or about May 9, 2022 to November 14, 2022.  Ms. Moy was recruited by another attorney and Paul Napoli to work at the Firm.  Because of Ms. Moy's stellar career and reputation as an attorney, Paul Napoli offered Ms. Moy the job of "Department Head" of the Personal Injury Department of NAPOLI SHKOLNIK PLLC.

18.     Defendant Napoli  Shkolnik PLLC. (hereinafter, "Napoli Shkolnik" or " Firm") is a domestic professional limited liability company with its principal place of business in New York County, New York. At all relevant times through present, the Firm is and has been an "employer" of Plaintiff with more than 15 full time employees.

19.   Defendant Paul Napoli is a white male, and is a principal of the Firm. At all relevant times through present, Mr. Napoli is and has been an "employer" of Plaintiff and has directly participated in the unlawful conduct described herein.

20.   Defendant Marie Napoli is a white female, and is a principal of the Firm. At all relevant times through present, Ms. Napoli is and has been an "employer" of Plaintiff and has directly participated in the unlawful conduct described herein.

21.   Defendant Salvatore C. Badala is white male, and is the General Counsel of the Firm. At all relevant times through present, Mr. Badala is and has been an "employer" of Plaintiff and has directly participated in the unlawful conduct described herein.

22.   Defendant Gloria Werle is a white skinned female and is the Chief Operating Officer and Director of Human Resources of the Firm. At all relevant times through present, Ms. Werle is and has been an "employer" of Plaintiff and has directly participated in the unlawful conduct described herein.

## FACTUAL ALLEGATIONS

## PLAINTIFF'S BACK GROUND, HER HIRING AND DEFENDANTS' FALSE PROMISES

23.   Ms. Moy is an Attorney, licensed to practice in the State of New York. She was admitted to the Bars of the State of New York and State of New Jersey as well as being admitted to Federal Court in New York and New Jersey.

24.   Plaintiff was graduated from Touro University Jacob D. Fuchsberg Law Center in 1992, where she earned her *Juris Doctor*. Before attending law school, Ms. Moy attended the Boston University and earned a Bachelor's Degree in Psychology and Philosophy in 1989.

25.   Ms. Moy has 28 years of experience as an attorney working as a partner in private law

firms and staff counsel for a major insurance company.  In May of 2022, at the time she was hired by the Firm, Plaintiff was to fill the "new role as Department Head" and was to "be working with the PI [Personal Injury] leadership team to review process, establish and implement improvements, policies and procedures."  Further, Ms. Moy was hired to "jointly manag[e] the paralegal staff and day to day activities related to case management."

26.     Plaintiff was to be peripherally "involved with upcoming trials".  However, Plaintiff was hired primarily to be a manager and was to be "an integral part of the team" which was to "collaboratively" work "to assist in achieving [ ] departmental goals and maintaining positive client relationships." Plaintiff made it clear that she could not perform her job as a case manager if she had a caseload, as a case manager is a full time job in it of itself.  This was agreed upon by Defendant Paul Napoli.

27.     Plaintiff conducted her hiring discussions primarily with Defendant Paul Napoli. Plaintiff also interviewed with Marie Napoli and Hunter Shkolnik.  During her negotiations leading to Plaintiff taking the job and during the first month of her employment it was requested that she be involved in marketing the Firm to the Chinese community.  Defendant Paul Napoli discussed that just like Attorney Chun Ho Chung does with the Korean community that Plaintiff could obtain a number of Chinese clients for the firm. Upon information and belief approximately 75% of the cases/clients in the Personal Injury practice are Korean and are from Mr. Chung.

28.     Plaintiff and Mr. Chung spoke numerous times in the beginning of Plaintiff's tenure with the Firm, as Plaintiff had been asked to help market the Chinese community.  The rational was to seek a greater presence in the Chinese market because there are more Chinese people than Korean people in New York.  Plaintiff spoke to and emailed the marketing director - Maria Hayashi- and

Plaintiff spoke to the only Chinese translator - to begin marketing tot he Chinese community. However, no resources were afforded Plaintiff and marketing to the Chinese community never proceeded. Maria Hayashi had negative opinions on marketing - and shared that the Firm had tried marketing to the Chinese community before and nothing really worked. Maria Hayashi also stated that the failed marketing was because they had no Chinese attorneys to put in the ads until Plaintiff was hired.

## THE MANIPULATION OF THE ORGANIZATIONAL CHART TO ALTER TERMS OF EMPLOYMENT

29. After being hired, Ms. Moy observed that she and her position had been excluded from the Firm organizational chart. After lodging a complaint that she had been excluded, in or about August 17, 2022 the firm sent out the new Personal Injury Department organizational chart that finally included Ms. Moy.

30. Although Ms. Moy was included in the new chart, Heather Palmore (an African-American woman) was no longer on the chart. In addition to Ms. Palmore being excluded, the only Asian partner at the firm, Chun Ho Chung, was summarily demoted to the "translation team". Also, new associates Raven Lewis (African American female) and Nick Mindicino were also not listed -even though they had cases in the Personal Injury Department.

31. On August 18, 2022 Ms. Moy emailed the head senior paralegal Ashley Bohs, Gloria Werle, Paul Napoli, Marie Napoli and complained that the chart had errors in it and set out the information about the exclusion and demotion of the employees of color. Ms. Moy also alerted Ms. Palmore of this action taken to exclude her from the organization chart.

32.    The response from paralegal Bohs only addressed Ms. Palmore, which was that Ms. Palmore was taken off the chart because she did not have a caseload and had no case management team assigned to her.

33.    This reasoning did not make sense to Plaintiff as Ms. Palmore never had a caseload before, and she was on the previous organizational chart that was in effect in May 2022.   Based on her observations,  it was clear to Plaintiff that the false rational provided in response to her complaint was little more than a pretext for the discriminatory actions being taken by the firm.

34.    Following Plaintiff's complaints about the organizational charts and support for Ms. Palmore, Ms. Moy began to be excluded from meetings that she was supposed to be a part of - including: partner meetings, trials status/assignments, high value cases aka "Million Dollar cases", claims meetings, some case management meetings and finance meetings.   This exclusion from meetings to which Plaintiff should have been invited was part of the mistreatment, discrimination and retaliation to which Plaintiff was subjected. Plaintiff complained about being  excluded from case management meetings in August 2022.

35.    When Plaintiff complained of this treatment and asked Defendant Paul Napoli why she was being excluded from vital attorney meetings, his response was that Defendant Gloria Werle and the others did not want to bother Plaintiff when she was preparing for a trial.  Following this complaint, Defendant Paul Napoli advised Plaintiff that he would tell staff to include Plaintiff again. This exclusion then slowed and then began to increase again until Plaintiff's improper termination.

36.    Following Plaintiff rasing questions about the organizational chart and the failure of Defendants to include her initially and then the exclusion of Ms. Palmore, Plaintiff was not told that her job responsibilities changed or that her title was summarily reduced to (co-department head) until

it was announced to the entire firm. Plaintiff was demoted to "supervising atty" in the NYC office without any advance notice to her.

37.     Concerning this demotion, Plaintiff immediately called Defendant Paul Napoli about this act, and he said that the chart was sent out without his approval and it was wrong.  Defendant Paul Napoli informed Plaintiff that she was still a Department Head but Joe Ciaccio (white male) would be running everything for now, but that Plaintiff would be running the NYC office to get it in shape since it was a "real mess."  Approximately two (2) days later Defendant Paul Napoli made an announcement in the next daily PI Meeting that he attended, and stated that Plaintiff was still "Co-Head" of Personal Injury.  However, the organizational chart was never corrected.

38.     Following Plaintiff's complaints about her mis-treatment,  Defendants made efforts to change her job duties from being a manager to handling a case load of 100 cases.  Plaintiff resisted and noted that she had not been hired to perform that function and that the attempts to change her job duties was being done without offering support staff/no paralegal/no case management team to help her.  This assignment of the 100 cases did not occur, but it was a clear message that Plaintiff was to stay in her place and not raise questions about her treatment and the treatment of others. Defendants made it clear that Plaintiff would get no help and that she  had no chance to succeed handling a full caseload without any help.

## CONFIRMATION OF THE DEMOTION FROM THE FALSE STATUS OF DIRECTOR

39.     On September 2, 2022 Ms. Moy sent an email to Paul Napoli, Marie Napoli, Joseph Ciaccio and Ashley Bohs suggesting that Ms. Palmore should try a personal injury case as she had a level of experience that supported her ability to do so. This was part of the case management team and duties assigned to Ms. Moy to manage trials.

11

40.     The response from Marie Napoli was an unsupported excuse that Defendant Marie Napoli did not think Ms. Palmore had any trial experience and suggested that Ms. Palmore would need things written out for her and that she would need help with everything.

41.     Defendant Marie Napoli then dismissed Ms. Palmore and Ms. Moy's recommendation/choice by treating Ms. Palmore as though she had never tried a case before and then suggested that Ms. Palmore second seat two white men, rather than them second seat her.  This level of disrespect and discriminatory behavior was an excuse because Defendants did not really want Ms. Palmore to try a case.

42.     Ms. Moy voiced her concern for the disregard and dismissal of her selection and management of Ms. Palmore. Plaintiff alerted Defendants to the fact that her decisions were not being honored and were essentially being disregarded despite her being told that her title and duties were those of Department Head.

43.     Throughout her time in the Firm, Ms. Moy was denied support to do her work and prevented from having the support and respect to which other white members of the staff were provided.  Despite Mr. Moy asking for equal treatment and consideration, she was treated differently than her white co-workers.

## DIFFERENTIAL TREATMENT AND ALTERATION OF CONDITIONS OF EMPLOYMENT

44.     The levels and types of differential treatment were many and seriously impacted Ms. Moy's ability to perform her work and altered the terms an conditions of her employment. Some of those items which rose to a level of disrespect, differential treatment and race based actions include, but are not limited to:

a.      Being promised many times to get office support – at least a paralegal – this never came into existence.


b.      Ms. Moy noticed she was getting excluded and left out of discussions, opportunities, and denied input into decisions once she raised issues of differential treatment and after the email she sent out about the organizational chart and her complaint about the malpractice in the case she was given to try.

c.      Ms. Moy was excluded from meetings she was supposed to be a part of – including: partners meetings, trials status/assignments, high value cases aka "Million Dollar cases", claims meetings, some case management meetings and finance meetings.

d.      Ms. Moy was not told that her job responsibilities changed or that her title changed from Department Head to Co-Department Head until it was announced to the firm.  It was only after Ms. Moy's email about the organizational chart that excluded Ms. Palmore that she was demoted to "supervising attorney" in the NYC office without any advance notice to her.

e.      When confronted by Ms. Moy, Paul Napoli said that the chart was sent out without his approval and it was wrong.  Paul Napoli then made contradictory statements claiming that Ms. Moy was still a Department Head but that Joe Ciaccio (a white man) would be running everything for now and she would be running the NYC office to get it in shape since it was a real mess.  This served as a demotion, as soon thereafter Paul Napoli made an announcement in the daily PI Meeting that Ms. Moy was still Co-Head of PI but the Chart was never corrected.

f.      The contacts in the form of input and meetings lessened once Ms. Moy began to voice her concerns of her treatment and the treatment of other employees of color.  At the start of her employment, she had daily meetings with Paul Napoli. Her access to decision making and opportunities to provide input went from daily meetings to twice a week, to once a week and then in August 2022 , to no more check in meetings or status reports involving Ms. Moy.

g.      During her entry into her employment and negotiations with the firm, Ms. Moy had discussions with Paul Napoli that she should market to the Chinese community to seek business from that community just as the firm had done with the Korean community.  But the promise to do so never was followed through. Ms. Moy's value to the firm and to increase business was treated with disregard.

h.      Ms. Moy discussed with Paul Napoli that she could use her contacts with insurance carriers – claims departments – to try to help settle the firm's medical mal-practice cases.  This offer was rebuffed and Ms. Moy's efforts were rejected.  Then,  rather than include Ms. Moy in the process,  Joe Ciaccio asked for her contact to the VP of Claims at Northwell and then tried to use Ms. Moy's contact to settle the case without her help.

i.      Joe Ciaccio asked for Ms. Moy's contact at another hospital, Montefiore, to do the same thing and try to settle the case by himself and not give Ms. Moy any credit.

j.      Joe Ciaccio had approximately 11 years experience, yet Ms. Moy who has over 27 years was never asked for any help with medical malpractice and nursing home cases.  In fact, Plaintiff possessed more than double the amount of experience of Mr. Ciaccio.  Furthermore, Joe Ciaccio was not admitted to practice law in New Jersey, where there were numerous medical malpractice and nursing home cases.  On the other hand, Ms. Moy was admitted to practice law in New Jersey but was never asked to help.  Indeed, Ms. Moy was not asked to help run or involve herself in those cases relating to medical malpractice and nursing home department.

k.      While those departments addressing medical malpractice and nursing home cases needed improvements,  Ms. Moy was denied any opportunity to engage her experience and abilities in those departments. This insult was race and gender based as it was clearly exclusionary to satisfy the white male egos that served to discriminate against Ms. Moy, no less the fact that her status as co-Department Head occurred when Joe Ciaccio was made the co-Department Head without any consultation, discussion or consideration for Ms. Moy.

l.      There were never any written complaints about Ms. Moy's performance until she began to complain about discrimination, mistreatment and acts of differential treatment shortly before her termination. Before making complaints, Marie Napoli wrote Ms. Moy at least 2 emails that the Firm was happy with her work and that the Firm knew she had worked hard and was learning the PI plaintiff side.  These emails were in response to Ms. Moy's emails that Defendants were trying to assign a caseload to her and she said that it was not part of her job responsibilities to work on a caseload.

m.      When The Firm Defendants tried to change her duties and assign Ms. Moy cases, she reiterated that she was not hired to work on a caseload but hired to do case management work.  The Napolis sent emails to Ms. Moy falsely stating that she was hired to work on cases, which was not true.  In fact, the announcement of Ms. Moy joining the firm never said she would work on a caseload.  When Ms. Moy had conversations with Paul Napoli about her hiring her and coming onboard – Ms. Moy was clear in telling him that she could not have a caseload while doing case management work as case management work was a full time job in it of itself.  In the negotiation process – Paul Napoli and she never agreed on a caseload.

n.      The firm summarily changed Ms. Moy's job to managing a case load of 100 cases but offered no support staff / paralegal/ case management team to help with this.  Then after changing her job responsibilities, they never assigned the 100 cases. Instead, they assigned numerous cases to Plaintiff and labelled her the "second attorney" for Joseph Napoli and directed her to work on various tasks on his cases.  Indeed, the Plaintiff had not authority to resolve those cases and she was not permitted to use Joseph Napoli's paralegals to assist her in completing those tasks.

o.       Joe Ciaccio, who is "Co-Department Head", is a white male, has paralegals, and a case management team for his assigned caseload.  With that level of support, he only covered court appearances.  He did not conduct depositions on a routine basis, trials or write motions.  In contrast, Ms. Moy was required to do all those duties without the support provided to Mr. Ciaccio.

p.       When Ms. Moy was preparing for a trial in October 2022, Joe Ciaccio pulled the paralegal who was working with Ms. Moy off the case and deprived her of trial support. Mr. Ciaccio sent an email to Ms. Moy stating that he pulled the paralegal off her case and that Ms. Moy had to go through him to see if she could use this paralegal.  Ms. Moy advised Paul and Marie Napoli on several occasions that she had no paralegal in general and no paralegal to help with the trial.  Even after providing these concerns, Ms. Moy never received any help.  Ms. Moy then had to complain to Joe Napoli, who intervened and got the paralegal to help her over Mr. Ciaccio's objections.

q.       In emails, Marie and Paul Napoli said Ms. Moy was paired with Joe Napoli so she "could learn from him."  In actuality, Ms. Moy was paired with him to fix his cases.  The attempt to mask and mis-state the reason for pairing Ms. Moy with Joe Napoli was a further disrespect and devaluing Ms. Moy.

r.       Ms. Moy was never put on an Action/Performance Plan or any form of a performance improvement plan.  Clearly, if the Firm had any issues with Plaintiff's performance, some notice and opportunity to address those concerns would be present.

s.       The alleged reasoning for terminating Ms. Moy were pretextual and are false as she was terminated without having a caseload so the reasons were not applicable.

t.       The termination of Ms. Moy is closely linked in time to her raising questions about the treatment of persons of color, including herself, and was done with no backup plan for her departure.  Without question, the discrimination faced by Ms. Moy and the retaliation that followed was not related to her performance.

u.       There are no Asian female attorneys at the Firm, other than Ms. Moy, and there is one Asian male attorney who has been subjected to disparate treatment.

## THE SHAM TASK FORCE ON 'DEI' AND HOSTILE AND UNCARING WORK ENVIRONMENT

45.     At the insistence largely of the employees of color, a Task Force was created to allegedly address issues of discrimination and lack of diversity in the Firm.  One of the outcomes of the Task Force was the creation of an Employee Survey to be completed by members of the Firm.

46.     On August 23, 2022, Defendant Gloria Werle sent the Partners of the Firm a draft of the Employee Survey that was generated by Human Resources and asked for input.

47.     Question 13 on the Survey stated, "Do you feel the Firm fosters inclusion and protects employees from discrimination and harassment?"   Heather Palmore commented that the question may be confusingly compound and suggested it broken into the following separate questions, (a) "Does the Firm foster and promote diversity, equity and inclusion," and (b) "Does the firm protect its employees from discrimination and retaliation?" Ms. Palmore's suggestion was rejected.

48.     A Task Force meeting was held on September 22, 2022, to discuss the results of the survey and what improvements the Firm could make. Plaintiff found it strange that she was not asked to join this important meeting, so she volunteered to join.

49.     The 2022 Employee Survey included a response that the firm tolerated racial discrimination by commenting on employees' accents and pronunciation, sexual harassment and intimidation.

50.     During the meeting, Heather Palmore requested a breakdown of the Employee Survey which would show the number of respondents and satisfaction results for each question. This was necessary as Defendant Gloria Werle had circulated only the 2018 breakdown to the Task Force and Ms. Palmore and Plaintiff felt the same information should be provided for the 2022 survey so the results, trends and developments over time could be reviewed.

51.     Defendant Gloria Werle refused to circulate these results and instead said she would only provide the breakdown to Ms. Palmore.  After the Task Force Meeting, Ms. Palmore did not receive any responses to her requests for the Employee Survey results. Upon information and belief, this disclosure never happened. Upon information and belief, the Survey results showed employees

16

believed there is discrimination based on race and gender.

52.     In that Task Force meeting,  Ms. Palmore also stated to the Task Force that DEI (Diversity, Equity and Inclusion) was an issue within the Firm, and that the Firm had to take this concern more seriously and that there must be a clear stance against discrimination.   In response, Defendant Gloria Werle  said that, "As a Latina woman who was put in charge of overseeing operations in Puerto Rico, I have never experienced discrimination, so I don't know what you mean by discrimination."

53.     Plaintiff was offended. In addition, after the meeting, upon talking to everyone who attended the meeting, almost everyone voiced their feeling that the statements made by Defendant Gloria Werle were inappropriate and offensive.   The magnification of these statements occurred due to the outrage and disbelief created from the fact that these statements were made by the Head of Human Resources.

54.     The fact that Defendant Gloria Werle  does not believe diversity, inclusion, discrimination and equity are a priority - even though she is tasked with the responsibility to make sure that the workplace is  a safe, non toxic, harassment free, diverse, equitable and inclusive environment was even more shocking.

55.     Up until that time Defendant Werle had given no indication that she was claiming that she was a Latino woman or identified as such as it did not appear to Plaintiff that she had a Latino heritage.   This statement by the Head of Human Relations was not only upsetting but was consistent with the attitude Defendants demonstrated in dealing with issues of discrimination, diversity and inclusion.

56.     On or about December 13, 2022 a female African-American employee who also attended the Task Force Meeting emailed Defendant Gloria Werle to follow-up on the Employee Survey results regarding race discrimination.  Based on information and belief, this employee made numerous requests to HR for this information but was never provided the results as requested.

57.     Following the request made for the information and Survey results by this African-American woman, she was fired in early 2023 by the Firm.

58.     Once Plaintiff began working for the Firm,  she soon found that she had been hired under false pretenses and was being required to take on a case load and in fact the case loads of other attorneys. At the same time, Ms. Moy began to see how she and other persons of color were treated differently than her white counterparts.   Plaintiff also became hesitant to fully address her wrongful treatment, as each time she did begin to address it or complain she was quickly discouraged and made to fear and to consider her efforts futile.

59.     Plaintiff learned that responses and attempts to address issues relating to diversity, equality/equity and inclusion were being met with hostile and irrational responses.  Plaintiff hoped that Napoli Shkolnik would be reasonable and open to discussions about improper and unlawful treatment. However, it became clear that the realization of Plaintiff's hope was unlikely given the negative disparate treatment she was experiencing and observing.

60.     The treatment afforded to Ms. Moy and others was contrary to the image that was being projected and suggested to the public and the communities from which the Firm sought and was urging potential clients to consider engaging the Firm.  Ms. Moy's experiences and observations were a stark contrast from what the Firm has espoused publicly and had represented to her at the time she was hired.

61.     Of great concern to Ms. Moy's day to day employment at the Firm was her being required to work with a person or persons who were made part of the Firm who are related to and possibly connected to extremist and/or hate groups that have made their derogatory positions about persons of color public on the national level. This created a high level of disturbance for Plaintiff.

62.     This concern also rises to a potential public concern as same relates to connections with persons who are part of The Firm who are possibly connected to hate groups that have made their derogatory positions about persons of color and persons who are from a different national origin public on the national level, as this decision by the Firm is contrary to the Firm's public statements about fairness, equity, justice and non-discrimination.

## WORK PERFORMANCE WAS NEVER AN ISSUE UNTIL DEFENDANTS NEEDED A PRETEXT TO TERMINATE PLAINTIFF

63.     Prior to her termination there were never any written complaints about Plaintiff's performance until the end in November 2022.  Defendant Marie Napoli wrote Plaintiff no fewer than 2 emails stating that Defendants were happy with Plaintiff's work, and that Defendants knew that she worked hard and was learning the Personal Injury plaintiffs' side.

64.     The emails from Defendant Marie Napoli were in response to Plaintiff's emails objecting to Defendants trying to assign her a caseload and cases.  Plaintiff made it clear that she had not been hired to work on cases as indicated in Defendants' offer of employment.

65.     Plaintiff was never advised in writing or verbally that there was an issue with her managing the calendar or workflow for court issued deadlines.

66.     On or about November 14, 2023 Defendants terminated Plaintiff in retaliation after she voiced support for the DEI issues, stated her support for Ms. Palmore, and after Defendants received

a letter from Ms. Palmore's attorneys in early November.  The content of that letter mentioned that another attorney in the Firm advised Ms. Palmore that *Ken Chesboro* was involved with and heavily influenced the January 6, 2021 insurrection and had been involved in President Trump's re-election effort.  The Defendants' hiring of Chesboro is contradictory to their claim of supporting diversity, equity and inclusion. Defendants took action against Plaintiff as they believed she was the source of information referenced in Ms. Palmore's letter.

67.   Plaintiff was terminated on November 14, 2023 during a telephone call from Defendants Gloria Werle and  Salvatore C. Badala.  In that call Plaintiff was told that while she was a "smart woman" and "super hard working", yet it was falsely claimed that she did not have the skills to do her job at the Firm.

68.   Plaintiff was never put on an Action/Performance Plan for any form of issues with her performance.  In the previous twenty-seven (27) years,  Plaintiff had never been terminated from employment.

69.    During the phone call from Defendants Gloria Werle and  Salvatore C. Badala, Plaintiff was emailed a termination memo.  This job termination memo was the first time Plaintiff had any notice of any claimed deficiencies.

70.   Plaintiff was never provided with any office support that would help her succeed in her job.  Every other attorney with a caseload was afforded the support of one or two paralegals. Plaintiff complained over the phone, in person and in writing that she needed a paralegal. Plaintiff had numerous communications asking for a paralegal - Plaintiff  told Defendant Paul Napoli in person and on the phone, Defendant Gloria Werle on the phone and through emails to Defendants Paul Napoli, Marie Napoli and Gloria Werle.

71.     The Plaintiff's case management duties were in essence eliminated when she was excluded from meetings.

72.     Ms. Moy was impacted seriously on numerous levels by Defendants' discriminatory actions. At first, Plaintiff was at a loss as to what she would or could do when she was not taken seriously, and then her harm was magnified when she was told she was being terminated.

73.     This treatment and termination occurred despite Plaintiff's solid and successful work product which continued to manifest itself even after Ms. Moy's termination.

74.     Plaintiff worked hard to try to overcome the differential, abusive, and retaliatory treatment to which she was subjected. Despite being held up to ridicule, Ms. Moy has maintained her professionalism. Even those efforts were met with comments which placed Plaintiff in a compromised position as to her family, work life, work environment and quality of life.

## THE FIRM WAS A HOSTILE AND UNWELCOMING PLACE FOR PEOPLE OF COLOR AND WOMEN

75.     The employment environment at the Firm was hostile and harmful to Plaintiff, women and other persons of color.

76.     The turnover rate at the firm was and remains high. From the time that Ms. Moy joined the firm on or about May 9, 2022 no fewer than 5 people left from the New York City office: 3 attorneys and 2 para-legals, all who are in protected classes. Of the 3 attorneys: 2 are female and one male attorney is a person with disabilities. Of the 2 para-legals: 1 is female and the other a homosexual Latino male.

77.     In addition, the staff turnover is even higher in Puerto Rico where the Firm pays women less than men.

78.     Without question, the behavior to which Ms. Moy has been subjugated was both unexpected and unwelcome.

79.     In May of 2022, just before Plaintiff started working for the Firm, two Korean translators were fired, allegedly because they were not allowed to work at home. Those two employees, Julie Cho and Hanna Baek had both voiced concerns to traveling to the office because of the Anti-Asian Hate crimes which were taking place around the NYC and on the subways.

80.     While non-Asian staff in the NYC office were allowed to work from home, these two Asian woman who voiced their fear and concern for safety were denied that opportunity. This was especially concerning as a large part, if not most, of their jobs could be done remotely. Their jobs entitled calling clients and getting information from them to fill out paperwork.

81.     The issue of safety for these Asian women was ignored and they were victimized for raising an issue to the Firm about their real needs as Asian women. They did not need to be in the office to speak to clients. The Firm did not afford these women the same opportunity and options provided to white workers in the Firm.

82.     Before her termination, Hanna Baek asked for a raise and there was no response in any way about her request for a raise. The ignoring of requests by, and the needs of, persons of color in the office was a regular practice and pattern of behavior.

83.      Diane Park, a Korean-American woman, was a paralegal for Joseph Napoli. Ms. Park worked for him for several years. Ms. Park left the Firm in June 2020, before Plaintiff was hired by the Firm. Upon information and belief, Ms. Park also asked to work from home because of COVID and the Anti-Asian Hate crimes. She too was denied the ability to work from home.

84.     In a consistent act of retaliation, after Ms. Park gave two (2) weeks notice and tendered her resignation, the Firm fired her before her noticed date came about.  Upon information and belief, she had to go to a doctor's appointment on one of those days within the 2 weeks notice period and they fired her.

85.     In or about the middle of 2020, Mr.  Darnell Liburd, an African-American paralegal was told he had to report to work full-time when no one else was reporting to the office due to COVID restrictions. Because of the COVID restrictions, the attorneys and staff were working remotely. None of Mr. Liburd's attorneys for whom he worked were in the office.

86.     Mr. Liburd was the only paralegal forced to come into the office.  Mr. Liburd was also an attendee of the Task Force.  In April 2023, the firm terminated his employment.

**DEFENDANTS ENGAGE IN ACTS OF RETALIATION AND VINDICTIVENESS**

87.     Following her wrongful termination, Defendants contacted Plaintiff's new employer to  retaliate against her by raising false and scurrilous claims and accusations against her and demanded the withdrawal of Plaintiff's new employer from cases held with their offices.

88.     In a letter dated January 11, 2023 from Defendant Salvatore C. Badala, Defendants stated that they  "write now to request that Goldberg Segalla voluntarily withdraw as counsel for the Defendants it represents in the listed matters attached as Exhibit 1." The Exhibit 1 was a listing of cases that totaled 226 in number.

89.     Defendant Badala, in an act of retaliation and attempt to silence and intimidate Plaintiff,  went on to say that the letter, "is necessitated by your firm's recent decision to hire Selma Moy, Esq.,[ ] who was our former Department Head of the Personal Injury Group.[ ]"

90.     Defendant Badala goes on to write that, "[w]e were disappointed to learn on our own of Ms. Moy's affiliation with your firm, and express that we would have expected the professional courtesy of a formal notification. During Ms. Moy's tenure at our firm, as the former Department Head of the Personal Injury Group, she was intimately involved in strategic decisions we made in representing the below plaintiffs against your clients. Therefore, this gives rise to a statutory conflict of interest for your firm to continue representing the below defendants now that Ms. Moy works for your firm."

91.     The Badala letter sent on behalf of the Firm goes on to allege that Plaintiff's new employer had to step down from the 226 cases because the Firms "clients have not provided Ms. Moy with informed consent."  The letter plus attachment amounted to 91 pages and was intentionally sent to interfere with Ms. Moy's employment with her new employer.

92.     Defendant Badala and The Firm knew that Plaintiff had no caseload so she did not work on any cases on a day to day basis, yet they falsely asserted that Plaintiff had "represented the plaintiffs in the very same matters and acquired extensive knowledge of our clients' confidences."

93.     In addition, all 226 case were products liability cases, of which Ms. Moy was never involved with during her employment at the Firm since she was in another department.

94.     Defendants knew that Ms. Moy did not have any "extensive knowledge" about the cases or the clients addressed in their laundry list of cases.  The Defendants intended to cause anguish and mental distress as well as harm Plaintiff in her new employment relationship with her current employer.

**AS AND FOR COUNT I**

**DISCRIMINATION  AND HARASSMENT IN VIOLATION OF 42 U.S.C. § 1981**

95.     The Plaintiff repeats, reiterates, and re-alleges each allegation contained in paragraphs 1 through 94 of this Complaint with the same force and effect as though fully set forth herein.

96.     By the actions described above, among others, Defendants have discriminated against Plaintiff because of her race, color and national origin in violation of Section 1981, including but not limited to, by denying her equal terms and conditions of employment and subjecting her to a hostile work environment.

97.     Through the conduct described above, Defendants have discriminated against Plaintiff on the basis of her race, color and national origin in violation of Section 1981 by fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment.

98.     As a direct and proximate result of Defendants unlawful discriminatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm or which she is entitled to an award of damages.

99.     Defendants unlawful and discriminatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

100.     The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

101.     That by reason of the foregoing, Plaintiff has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public

humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT II

## RETALIATION IN VIOLATION OF SECTION 1981

102.    The Plaintiff repeats, reiterates, and re-alleges each allegation contained in paragraphs 1 through 101 of this Complaint with the same force and effect as though fully set forth herein.

103.    By the actions described above, among others, Defendants have retaliated against Plaintiff because of her engagement in protected activities in violation of Section 1981, including but not limited to, denying her equal terms and conditions of employment and subjecting her to a hostile work environment.

104.    Through the conduct described above, Defendants have retaliated against Plaintiff on the basis of her engagement in protected activities in violation of Section 1981 by fostering, condoning, accepting, ratifying, and/or otherwise failing to prevent or to remedy a hostile work environment.

105.    As a direct and proximate result of Defendants unlawful retaliatory conduct and harassment in violation of Section 1981, Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

106.    Defendants unlawful and retaliatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.

107.     The individual Defendants aided, abetted and actually participated in the unlawful conduct.

108.     That by reason of the foregoing, Plaintiff has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT III

## DISCRIMINATION AND HARASSMENT IN VIOLATION OF THE NYSHRL

109.     The Plaintiff repeats, reiterates, and re-alleges each allegation contained in paragraphs 1 through 108 of this Complaint with the same force and effect as though fully set forth herein.

110.     By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her race, color, national origin and gender in violation of the NYSHRL and/or subjected her to a hostile work environment.

111.     As a direct and proximate result of Defendants unlawful discriminatory conduct and harassment in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

112.     Defendants unlawful and discriminatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

113.     The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

114.     That by reason of the foregoing, Plaintiff has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT IV

## RETALIATION IN VIOLATION OF THE NYSHRL

115.     The Plaintiff repeats, reiterates, and re-alleges each allegation contained in paragraphs 1 through 114 of this Complaint with the same force and effect as though fully set forth herein.

116.     By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her engagement in protected activities in violation of the NYSHRL.

117.     As a direct and proximate result of Defendants unlawful retaliatory conduct in violation of the NYSHRL Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

118.     Defendants unlawful and retaliatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the NYSHRL, for which Plaintiff is entitled to an award of punitive damages.

119.     The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

120.     That by reason of the foregoing, Plaintiff has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged

in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT V

## DISCRIMINATION AND HARASSMENT IN VIOLATION OF THE NYCHRL

121.    The Plaintiff repeats, reiterates, and re-alleges each allegation contained in paragraphs 1 through 120 of this Complaint with the same force and effect as though fully set forth herein.

122.    By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her race, color, national origin and gender in violation of the NYCHRL and/or subjected her to a hostile work environment.

123.    As a direct and proximate result of Defendants unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

124.    As a direct and proximate result of Defendants unlawful discriminatory conduct and harassment in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

125.    Defendants unlawful and discriminatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

126.    The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

127.    That by reason of the foregoing, Plaintiff has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public

humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## AS AND FOR COUNT VI

### RETALIATION IN VIOLATION OF THE NYCHRL

128.     The Plaintiff repeats, reiterates, and re-alleges each allegation contained in paragraphs 1 through 127 of this Complaint with the same force and effect as though fully set forth herein.

129.     By the actions described above, among others, Defendant retaliated against Plaintiff on the basis of her engagement in protected activities in violation of the NYCHRL.

130.     As a direct and proximate result of Defendants unlawful retaliatory conduct in violation of the NYCHRL Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

131.     Defendants unlawful and retaliatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

132.     The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

133.     That by reason of the foregoing, Plaintiff has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

**AS AND FOR COUNT VII**

**NEW YORK STATE CIVIL RIGHTS LAW §40-C**

134.    The Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs 1 through 133 of this Complaint with the same force and effect as though fully set forth herein.

135.    Prior to the filing of this complaint a copy has been provided to the office of NYS Attorney General with a request for that office to take action against Defendant.

136.    The New York State Civil Rights Law § 40-c which outlaws discriminatory practices, states in relevant part:

1. All persons within the jurisdiction of this state shall be entitled to the equal protection of the laws of this state or any subdivision thereof.

2. No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability, as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state.

137.    By the actions described above, among others, Defendants have discriminated against Plaintiff on the basis of her race, color, national origin and gender in violation of the NYCHRL and/or subjected her to a hostile work environment.

138.    As a direct and proximate result of Defendants unlawful discriminatory conduct in violation of the New York State Civil Rights Law § 40-c , Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of monetary damages and other relief.

139.    As a direct and proximate result of Defendants unlawful discriminatory conduct and harassment in violation of the New York State Civil Rights Law § 40-c , Plaintiff has suffered, and continues to suffer, monetary and non-monetary harm for which she is entitled to an award of damages.

140.    Defendants unlawful and discriminatory actions constitute intentional, malicious, willful, wanton and/or reckless violations of the New York State Civil Rights Law § 40-c , for which Plaintiff is entitled to an award of punitive damages.

141.    The individual Defendants aided, abetted and actually participated in the unlawful conduct described herein.

142.    That by reason of the foregoing, Plaintiff has been subjected to economic losses and psychological injury, distress, pain, suffering, loss of self-esteem, self-doubt, disgrace, public humiliation, embarrassment, inconvenience, anxiety and frustration, and, thus, has been damaged in excess of five million ($5,000,000.00) dollars, as well as punitive damages, costs and attorney's fees.

## **PRAYER FOR RELIEF**

Plaintiff requests judgment as follows:

a.    First Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

b.    Second Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

c.    Third Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

d.      Fourth Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

e.      Fifth Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

f.      Sixth Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

g.      Seventh Count: in excess of five million ($5,000,000.00) dollars as well as punitive damages, costs and attorney's fees.

h.      Attorney's fees and costs, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5(k) and other fee and costs statutes including the New York City and New York State Human Rights Laws;

i.      A declaratory judgment stating that Defendants wilfully violated Plaintiff's rights secured by federal and state laws as alleged herein;

j.      Injunctive relief: an injunction requiring Defendants to correct all present and past violations of federal and state law as alleged herein; to enjoin the Defendants from continuing to act in violation of federal and state law as alleged herein; and to order such other injunctive relief as may be appropriate to prevent any future violations of said federal and state laws; and

k.      An Order granting such other legal and equitable relief as the court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

Dated:  Hempstead, New York
   May 4, 2023                            LAW OFFICES OF
                                          FREDERICK K. BREWINGTON


                          By:    *Frederick K. Brewington*
                                 FREDERICK K. BREWINGTON
                                 Attorneys for Plaintiff
                                 556 Peninsula Boulevard
                                 Hempstead, New York  11550
                                 (516) 489-6959